# United States District Court

## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

DALE A. WILKERSON

v.

UNIVERSITY OF NORTH TEXAS, BY
AND THROUGH ITS BOARD OF
REGENTS; NEAL SMATRESK,
PRESIDENT; FINLEY GRAVES, INTERIM
PROVOST AND VICE PRESIDENT FOR
ACADEMIC AFFAIRS; WARREN
BURGGREN, FORMER PROVOST AND
VICE PRESIDENT FOR ACADEMIC
AFFAIRS; ARTHUR J. GOVEN, FORMER
DEAN, COLLEGE OF ARTS &
SCIENCES; AND PATRICIA
GLAZEBROOK, FORMER CHAIR,
DEPARTMENT OF PHILOSOPHY AND
RELIGION STUDIES

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 4:15-CV-00540
Judge Mazzant

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. #48). After reviewing the relevant pleadings and motion, the Court finds the motion should be granted in part.[1]

## BACKGROUND

This case arises from the non-renewal of an employment contract for a non-tenured professor. Plaintiff Dale Wilkerson was originally hired by the University of North Texas ("UNT") in 2003 as a Lecturer in the Department of Religion and Philosophy (the "Department") in the College of Arts and Sciences. In 2008, Plaintiff was reappointed and promoted to Principal Lecturer. Principal Lecturer is the highest level attainable at UNT for any teacher who is not

---

[1] On November 30, 2016, the Court entered an order denying Defendants' Motion for Summary Judgment with regard to the Title IX claim against UNT (Dkt. #86). The Court now disposes of the rest of Defendants' Motion for Summary Judgment.

tenured or on a tenure-track appointment. In 2011, Plaintiff renewed his contract with UNT for a "one-year appointment with a five-year commitment to renew at the option of the University" (Dkt. #48, Exhibit 1). At the time Plaintiff signed this contract, the Chair of the Department, Dr. Patricia Glazebrook ("Glazebrook"), told Plaintiff that the renewal provision was for the convenience of UNT if there was a reduction in workforce that necessitated non-renewals.

While Plaintiff was under one-year contracts with UNT before 2011, he received formal annual renewals each year after going through a renewal process. During the 2011 contract, he did not go through any process and did not receive formal renewals, but he did receive pay raises and his contract was in fact renewed.

Plaintiff was ultimately terminated in July 2014. At the time of Plaintiff's firing, he had eleven years of service with UNT. Before Plaintiff's termination, the only known causes for discharge of teachers with long years of service were because of elimination or reduction of a particular program, a general reduction in force, or the commission of a serious violation of UNT's policies and procedures.

On March 1, 2013, Plaintiff met a 26-year-old female, CB, at a graduate student recruitment weekend at the house of the Director of Graduate Studies ("DGS"), Dr. Gene Hargrove ("Hargrove"). CB had applied to UNT in the Fall 2011 semester, and was admitted for the Fall 2012 semester, but she deferred her enrollment until the Fall 2013 semester. On May 31, 2013, Plaintiff was approached at a local music venue by CB, who was in town for job training. CB and Plaintiff discussed their shared interest in music, running, and work at the Center for Environmental Philosophy.

Between June 1, 2013, and June 3, 2013, CB went to Plaintiff's house several times. On June 2, 2013, CB was at Plaintiff's house until the early hours the next morning. During this

visit, Plaintiff kissed CB twice. This encounter was the basis of CB's complaint with the Office of Equal Opportunity ("OEO").

CB's complaint with the OEO alleged that while she and Plaintiff were at Plaintiff's house on June 2, Plaintiff held CB down, kissed her, and asked her to undress. Plaintiff kissed CB again when he dropped her off at her house later that night. CB did not recall who initiated either kiss but claimed that they were not consensual. Plaintiff admits to kissing CB, but denies allegations that he held her down, asked her to undress, or that either kiss was not consensual.

On June 30, 2013, CB invited herself to attend a concert in Memphis, Tennessee, that Plaintiff was attending with a platonic female friend over the Fourth of July holiday. CB, Plaintiff, and the female friend agreed to share a hotel room to save expenses. No sort of romantic activity occurred. Plaintiff claims that he did not know of CB's enrollment at UNT until this time. Also, at this point in time, CB was not taking and had not taken any courses by Plaintiff. Glazebrook appointed Plaintiff to DGS in September 2013.

On February 7, 2014, CB filed a complaint alleging that Plaintiff sexually harassed her during the June 2, 2013 encounter. On February 24, 2014, the OEO initiated a formal investigation.

On March 26, 2014, Glazebrook conducted Plaintiff's evaluation for 2011–2013. Among other statements, she noted that Plaintiff ranked second out of thirteen faculty members for teaching. In early April 2014, Plaintiff asked Glazebrook why he had not received a letter renewing his teaching appointment for the 2014–2015 academic year. Glazebrook told Plaintiff that she was withholding the letter pending the outcome of a complaint to the OEO.

In a report dated May 12, 2014, the OEO found (1) at the time of the incident, Plaintiff did not have authority over CB and therefore could not be in violation of the consensual

relationship policy; and (2) there was insufficient evidence to establish a violation of UNT's sexual harassment policy. CB did not appeal the OEO's finding. After Glazebrook received the OEO report, she told Plaintiff "we are good now" and "this letter in your file is all we need."

On July 3, 2014, Plaintiff received a letter from Glazebrook notifying him of UNT's decision not to renew his contract and of his ability to file a grievance.

According to the Department Bylaws, a grievance should follow the following steps: (1) a complaint filed with the Department Chair; (2) referral by the Chair to the Executive Committee; (3) advice and counsel to the Chair by the Personnel Affairs Committee ("PAC"); (4) formation of the Ad Hoc Grievance Committee ("Grievance Committee"); (5) the Chair forwards his or her recommendation to the Dean; (6) referral to the Provost.

Upon receiving the letter of termination, Plaintiff immediately appealed his discharge to the Executive Committee. The Executive Committee Chair Irene Klaver ("Klaver") initiated a request for Glazebrook to meet with the Executive Committee to resolve the conflict. Glazebrook repeatedly thwarted Klaver's efforts by refusing to meet with the Executive Committee as a whole. Instead, Glazebrook requested to communicate through Klaver; claimed that the Bylaws did not apply; and insisted that the only grievance procedure was through the Associate Dean Steve Cobb or the University Review Committee, as indicated in the termination letter.

The appeal eventually resulted in the formation of a Grievance Committee. In a report dated July 25, 2014, the Grievance Committee found that (1) Glazebrook violated the Department Bylaws by not consulting with the Executive Committee or PAC; (2) she had been uncooperative and untruthful during the investigation; (3) due process and equal protection standards were clearly violated; and (4) there was no factual basis for firing Plaintiff. In the report, the Grievance Committee focused partly on the fact that Glazebrook did follow

appropriate Bylaws and procedures with a previous non-renewal of non-tenured faculty in 2011. The Grievance Committee unanimously recommended that the Dean reverse Glazebrook's decision.

The Grievance Committee report was forwarded to the Dean of Arts and Sciences, Dr. Arthur Goven ("Goven"). Goven reviewed the OEO report, Glazebrook's recommendation, and the Grievance Committee report. Goven also had a discussion with Plaintiff. Ultimately, Goven found that Plaintiff acted with "poor professional judgment." Goven based this finding on information supplied by Glazebrook, which indicated that Plaintiff had accepted the job as DGS before June 2, 2013, and that he knew or should have known that CB would be under his influence in the fall semester.

Plaintiff appealed to the Provost and Vice President for Academic Affairs, Dr. Warren Burggren ("Burggren"). Burggren charged a subcommittee of the Grievance Committee (the "Subcommittee") with investigating Plaintiff's grievance. In a report dated January 26, 2015, the Subcommittee found that Plaintiff's due process rights had been violated because Glazebrook failed to consult with the Department PAC. However, the Subcommittee ultimately found that Plaintiff "did indeed exercise poor professional judgment" (Dkt. #48, Exhibit 5 at p.5). The Subcommittee stated that the "charge of poor judgment would remain whether or not Wilkerson was DGS [at the time of the incident] because his involvement with the female student was not appropriate given her position as an incoming graduate student and employee in the [Department]" (Dkt. #48, Exhibit 5 at p.5). Further, the Subcommittee recommended that because Plaintiff's incident was one of several cases involving Department faculty members, "[t]hese problems must be addressed in a thorough and systematic fashion" (Dkt. #48, Exhibit 5

at pp.5–6). The Subcommittee did not make a recommendation whether Plaintiff should be fired or reinstated.

By the time the Subcommittee finished its inquiry, Burggren left and was replaced by Finley Graves. On March 17, 2015, the Interim Provost and Vice President for Academic Affairs, Finley Graves, sent Plaintiff a letter upholding the decision to not reappoint Plaintiff. This letter concluded Plaintiff's grievance.

On August 10, 2015, Plaintiff filed his original complaint asserting claims against UNT, Neal Smatresk, Finley Graves, Warren Burggren, Arthur Goven, and Patricia Glazebrook (collectively "Defendants") (Dkt. #1). On April 15, 2016, Plaintiff filed his First Amended Original Complaint asserting claims for violations of due process, equal protection, and retaliation under 42 U.S.C. § 1983, Title IX retaliation, breach of contract, and tortious interference with contract (Dkt. #36).

On August 25, 2016, Defendants filed a motion for summary judgment (Dkt. #48). On September 19, 2016, Defendants filed an additional attachment to its motion for summary judgment (Dkt. #69). On September 23, 2016, Plaintiff filed a response (Dkt. #74). On October 6, 2016, Defendants filed a reply (Dkt. #78).

On November 30, 2016, the Court entered an order granting in part Defendants' motion to dismiss (Dkt. #85). On the same day, the Court entered an order denying Defendants' Motion for Summary Judgment as to the Title IX claims against UNT (Dkt. #86).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda

will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but must "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Following the Court's order on Defendants' Motion to Dismiss, Plaintiff's only remaining claims are those against Burggren, Goven, and Glazebrook under § 1983 for due process based on Plaintiff's alleged property interest in continued employment and his alleged liberty interest in employment, as well as a state law claim for tortious interference. The Court will analyze each claim in turn.

### Due Process—Property Interest

The threshold requirement of any due process claim is the government's deprivation of a plaintiff's liberty or property interest. *DePree v. Saunders*, 588 F.3d 282, 289 (5th Cir. 2009) (citing *Moore v. Miss. Valley State Univ.*, 871 F.2d 545, 548 (5th Cir. 1989)). Without such an interest, no right to due process accrues. *Id.* When a plaintiff has a liberty or property right, the Constitution requires a pre-termination hearing so that the right is not "arbitrarily undermined." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

In Plaintiff's First Amended Original Complaint (Dkt. #36 at ¶¶ 99–116), Plaintiff alleges three theories for his claim for due process: (1) freedom to associate; (2) property interest in continued employment; and (3) a liberty interest in employment. In Plaintiff's briefs in response to the motions to dismiss and for summary judgment, he refers to the association basis as a claim

for substantive due process (*See* Dkt. #43 at p.10–12; Dkt. #74 at pp.25–28). The Court has already dismissed Plaintiff's claim on the basis that he lacked an associational right (Dkt. #85). Therefore, the Court needs only to address the property and liberty interest theories.

Defendants move for summary judgment on Plaintiff's due process claim based on a property interest in employment. Defendants argue that Plaintiff did not have a reasonable expectation of continued employment because the express terms of the contract and Department Bylaws state that the contract is "a temporary, non-tenurable, one-year appointment with a five-year commitment to renew at the option of UNT" (Dkt. #48 at p.13). Defendants further argue that Plaintiff cannot maintain a claim for due process based on deprivation of any property interest (Dkt. #48 at p.12). Plaintiff responds that a reasonable interpretation of the five-year agreement, based on its terms and representations by Glazebrook, ensures him of a job for that duration unless his termination was justified by some serious violation of UNT policy or a reduction in force (Dkt. #74 at p.13).

To have a property interest protected by the due process clause, a person "must have more than an abstract need or desire for [the benefit]." *Roth*, 408 U.S. at 577. "He must instead have a legitimate claim of entitlement to continued employment." *Id.* However, property rights are not limited to a few rigid, technical forms. Rather, property denotes a broad range of interests that are secured by "existing rules and understandings." *Id.*; *Perry v. Sindermann,* 408 U.S. 593, 601 (1972). Thus, a person may maintain an action for due process based on continued employment without proving that he is entitled to reinstatement. *Sindermann*, 408 U.S. at 604.

 "Property interests, of course, are not created by the Constitution." *Roth,* 408 U.S. at 577. Therefore, courts must look to state law to determine the sufficiency of a claim of entitlement. *Id.* However, state law alone "is not necessarily determinative." *Batterton v. Tex.*

*Gen. Land Office*, 783 F.2d 1220, 1223 (5th Cir. 1986). Therefore, the question before the Court is not whether UNT was within its right to terminate Plaintiff but rather was Plaintiff reasonable in expecting, based on rules and expectations, UNT to employ him for the fourth year of a five-year contract?

In *Perry v. Sindermann*, the Supreme Court determined that a professor had a reasonable expectation in continued employment despite the lack of a contract or tenure because the college had a set of "rules and understandings, promulgated and fostered by state officials." 408 U.S. at 602. The Supreme Court held that while an explicit contract provision would clearly be evidence of a claim of entitlement, it is not necessary. *Id.* at 601. Further, the Supreme Court held that a teacher who has held his position for a number of years might be able to show from the circumstances of his service, as well as other relevant facts, that he has a legitimate claim of entitlement to continued employment. *Id.* at 602. Although the college involved in *Sindermann* did not have a formal tenure provision, the Supreme Court acknowledged that the lack of a tenure provision is not necessarily determinative of the issue of whether outside understandings may increase a teacher's reasonable expectations. *Id.* Rather, the lack of a tenure provision just makes it more likely that additional understandings create a reasonable expectation. *Id.* On the other hand, it may take more to create an expectation without a tenure process. *Id.* While recent courts appear to abrogate this holding, close readings confirm that *Sindermann* is still the law. *See, e.g.*, *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992) ("Establishment of a formal tenure process *generally* 'precludes a reasonable expectation of continued employment' for non-tenured faculty." (citations omitted)). Even if these cases purport to abrogate *Sindermann*, they are further distinguishable on their facts, as explained below.

None of Defendants' cited cases deal with a plaintiff who received explicit statements from his or her employer. *See, e.g.*, *Batterton*, 783 F.2d 1223 (relying on custom alone); *Felder v. Hobby*, 199 F.3d 439, at *6 (5th Cir. 1999) (same); *Whiting v. Univ. of S. Miss.*, 451 F.3d 339 (5th Cir. 2006) (handbook alone); *Rodriguez v. Escalon*, 90 F. App'x 776 (5th Cir. 2004) (no allegations of custom or statements).

First, *Whiting* and *Spuler* dealt with professors seeking tenure based on vague or contradictory provisions in the faculty handbook. *Whiting*, 451 F.3d at 341–43; *Spuler*, 958 F.2d at 107 (holding that "[t]he unadorned language regarding tenure" did not create any reasonable expectation as to how it would be granted or the plaintiff's entitlement to it). Here, Plaintiff is claiming that he had an expectation of completing his "five-year commitment" based on assurances that UNT would exercise its option to renew each year, absent serious violations or a reduction in force. He is not claiming that he is entitled to a new contract, promotion, or other elevation in status at UNT. He is also not relying solely on vague or contradictory handbook provisions to usurp the terms of his contract. Rather, he asserts that Glazebrook's oral assurances as to how UNT would exercise its judgment during the "five-year commitment" and a long history of renewals for other non-tenured faculty created his reasonable expectation. Thus, this case is more like *Sindermann*.

Similarly, *Brown* is distinguishable because the plaintiff's alleged promises in *Brown* were too vague to reasonably expand expectations. For example, in *Brown*, the plaintiff was employed for ten years without a contract. *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 501 (Tex. 1998). She was told that she would be able to keep her job as long as she was "doing her job" and would not be fired unless there was "good reason or good cause" to fire her. *Id.* The Supreme Court of Texas held that the plaintiff was an at-will employee that could be

fired for any reason because the employer's vague statements did not amount to a "tenor and understanding between the parties, if any, that [plaintiff] would have many years of job security." *Id.* at 503–04. The Supreme Court of Texas then found that because plaintiff did not have a contract, her constitutional claims must fail. *Brown*, 965 S.W.2d at 504.

Here, Plaintiff was given a formal contract with a "five-year commitment to renew at the option of the University" (Dkt. #48, Exhibit 1). When he was hired, Glazebrook assured him that UNT would exercise its option to renew each year. UNT not only adhered to this assurance with regard to Plaintiff during his renewals in 2012 and 2013 but also with many other lecturers. In fact, the only known reasons for discharge of teachers with long years of service were because of elimination or reduction of a particular program, a general reduction in force, or the commission of a serious violation of UNT's policies and procedures. Finally, when Plaintiff did not receive his renewal at the expected time in April 2014, Glazebrook assured him that she was waiting on the outcome of the OEO investigation. In May 2014, the OEO report exonerated Plaintiff. After Glazebrook received the OEO report, she told Plaintiff that "we are good now" and "this letter in your file is all we need" (Dkt. #74, Exhibit J at p.2). Therefore, based on the assurances given to Plaintiff when he was hired, the context of his contract, and the circumstances leading up to his termination, a reasonable trier of fact could conclude that Plaintiff reasonably believed that he was entitled to the next year of his "five-year commitment." Each individual defendant subsequently upheld Plaintiff's termination, therefore causing a deprivation of his property right.

Further, fact issues remain as to whether Plaintiff was afforded constitutionally adequate procedural due process. Plaintiff was terminated in July 2014 without notice or opportunity to respond to his termination. Glazebrook and the Grievance Committee recognized that the timing of Plaintiff's firing would make it very difficult for Plaintiff to find a new job and for UNT to

find a replacement. Although Plaintiff was given an opportunity to be heard by the Grievance Committee, this opportunity was after the termination, may have been hollow in that it was too late for Plaintiff to find a new job, and was ultimately ignored by Burggren, Goven, and Glazebrook. Taking these facts in the light most favorable to Plaintiff, fact issues remain as to the constitutional adequacy of the due process that Plaintiff received. Therefore, Defendants have failed to prove the absence of a fact issue on Plaintiff's claim for deprivation of his substantive property right to continued employment and the procedural protections that go with it. Thus, Defendants' motion for summary judgment on the basis of Plaintiff's property interest is denied.

<u>Due Process—Liberty Interest</u>

Defendants also move for summary judgment on Plaintiff's due process based on his liberty interest. Defendants argue that they did not infringe Plaintiff's liberty interest because the details of his firing were not made public (Dkt. #48 at p.15). Plaintiff alleges that "[t]he very act of firing Plaintiff for cause . . . confirmed in the minds of many that he was guilty, regardless of the OEO findings, and this was exacerbated by the actions of the individual defendants in making statements that they agreed with Glazebrook's firing of Plaintiff" (Dkt. #74 at p.22).

To establish a liberty interest, an employee must demonstrate that his governmental employer has brought false charges against him that "might seriously damage his standing and associations in his community" or that impose a "stigma or other disability" that forecloses his "freedom to take advantage of other employment opportunities." *Roth*, 408 U.S. at 573.

The Fifth Circuit employs a seven-element "stigma-plus-infringement" test to determine whether a plaintiff has a § 1983 claim for deprivation of liberty without notice or opportunity to clear his name. *Bledsoe v. City of Horn Lake*, 449 F.3d 650, 653 (5th Cir. 2006) (citing *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 1981)). A plaintiff must show: (1) he was

discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard before the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request. *Id.*

"Neither damage to reputation alone nor the stigma resulting from the discharge itself trigger the protections of due process." *Bledsoe*, 449 F.3d at 653. Rather, a liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the employee is "discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *Hughes*, 204 F.3d at 226 (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)). The employee must show that "the governmental agency has made or is likely to make the . . . stigmatizing charges public 'in an official or intentional manner, other than in connection with the defense of [the related legal] action.'" *See Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th Cir. 1984) (quoting *Ortwein v. Mackey*, 511 F.2d 696, 699 (5th Cir. 1975)). When it is possible that clearly false information in a personnel file will not be kept confidential, the plaintiff must be given an opportunity to determine the factual issues regarding confidentiality. *Swinney v. Alexander*, 629 F.2d 1018, 1022 (5th Cir. 1980).

The Court finds that Plaintiff has failed to create a genuine issue of fact that the stigmatizing charges (a) were false, or (b) were made public. Therefore, summary judgment is proper on this claim.

First, Plaintiff has not raised a genuine issue that the stigmatizing charges made against him were false. Plaintiff claims simply that the act of firing him "confirmed in the minds of many that he was guilty, regardless of the OEO findings" (Dkt. #74 at p.22). Plaintiff alleges that

the stigmatizing charge was that he was guilty of sexual harassment. Plaintiff then claims that the accusation of sexual harassment was false because the OEO exonerated him (Dkt. #74 at p.22).

On February 7, 2014, CB filed a complaint alleging sexual harassment. The OEO initiated an investigation on February 24, 2014. The OEO's investigation and subsequent report contained charges for violation of UNT's Consensual Relationship Policy and Sexual Harassment Policy. The OEO found that Plaintiff was "not in violation" of UNT's Consensual Relationship Policy because Plaintiff was not in a position of authority over CB at the time of the incident. However, the OEO found "insufficient evidence to establish a violation" of UNT's Sexual Harassment Policy. Plaintiff was then fired for "poor professional judgment."[2] Glazebrook refused to explain what "poor judgment" means. The Subcommittee's report characterizes the charge of "poor judgment" as resulting from Plaintiff's "involvement with a female student . . . given her position as an incoming graduate student and employee in the Department" (Dkt. #48, Exhibit 5 at p.5). Finally, Plaintiff admits that he kissed CB twice, but contends that it was consensual. Based on these facts, and the inconclusiveness of the OEO finding, the Court finds that any allegations of sexual harassment were not false.

Second, Plaintiff has not raised a genuine issue that any stigmatizing claims were made public. Plaintiff alleges that the charges were made public because he "has been told by some that they heard he was fired for sexual harassment" (Dkt. #74 at p.21). However, neither Plaintiff nor his attorney provides evidence of who made those statements (*See* Dkt. #74, Exhibits A & W). Defendants have provided the affidavits of Goven, Graves, and Smatresk who all testify that

---

[2] The Court doubts whether the statements made by UNT are even stigmatizing. Plaintiff centers his entire complaint around the ambiguity for which Plaintiff was fired. Plaintiff repeatedly complains that Glazebrook "refused to tell" anybody what she meant by "poor judgment." Plaintiff has not pleaded any facts that UNT's officials ever claimed sexual harassment was the basis. While the connection is reasonable, the Court doubts that the statements alone are sufficiently condemnatory enough to withstand summary judgment. *See Vander Zee v. Reno*, 73 F.3d 1365, 1369 (5th Cir. 1996).

they never communicated to anyone outside of legal counsel, let alone outside of UNT, about the cause of Plaintiff's termination (Dkt. #48, Exhibits 13, 15, 16).

The crux of Plaintiff's complaint is that neither Glazebrook nor Goven ever provided any explanation to anyone about what they meant by "poor judgment." Plaintiff alleges that he "has been told by some" that he was fired for sexual harassment, but in support, Plaintiff only references his attempts to contact committee members on the inside of Plaintiff's termination (*See* Dkt. #74, Exhibit W). To have a cause of action for liberty interest in employment, the stigmatizing remarks must be made "in an official or intentional manner, *other than in connection with the defense* of [the related legal] action." *Ortwein*, 511 F.2d at 699 (emphasis added). Plaintiff does not provide any evidence satisfying this requirement.

Therefore, the Court finds that Defendants have proved that there is no genuine issue of material fact that (1) any allegations of sexual harassment are clearly false; or (2) stigmatizing charges were made public other than in connection with the defense of the related legal action. Because Plaintiff's liberty interest was not infringed, Plaintiff was not entitled to a name-clearing hearing. Thus, Defendants' motion is granted on Plaintiff's claim for due process on the basis of his liberty interest in employment.

<u>Tortious Interference</u>

Finally, Defendants move for summary judgment on the tortious interference claim. Defendants argue that the individual defendants were acting as agents of UNT and thus were incapable of interfering with Plaintiff's contract (Dkt. #48 at p.26). Further, Defendants argue that UNT did not breach the contract and therefore there is no interference (Dkt. #48 at p.26). Plaintiff claims that Burggren, Goven, and Glazebrook tortiously interfered with his contract

because they intentionally and knowingly caused Plaintiff to be terminated contrary to Plaintiff's contractual rights (Dkt. #74 at p.38).

To assert a tortious interference claim, a plaintiff must prove that (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) such intentional act was a proximate cause of the plaintiff's damage; and (4) actual damage or loss occurred. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A contracting party's agent or employee acting in the principal's interest cannot interfere with the principal's contract. *Holloway v. Skinner*, 898 S.W.2d 793, 798 (Tex. 1995). "To establish a prima facie case [of tortious interference by an agent with the principal's contract], the alleged act of interference must be performed in furtherance of the agent's personal interest . . . ." *Id.* at 796. Interference includes conduct that makes performance burdensome, difficult, or of less or no value to the one entitled to performance. *Int'l Union UAW v. Johnson Controls, Inc.*, 813 S.W.2d 558, 568 (Tex. App.—Dallas 1991, writ denied); *Tippett v. Hart*, 497 S.W.2d 606, 610 (Tex. Civ. App.—Amarillo) *writ ref'd n.r.e.*, 501 S.W.2d 874 (Tex. 1973) (per curiam).

Here, Plaintiff has alleged sufficient facts to create a fact issue as to whether Glazebrook was acting in UNT's interest or her personal interest. Glazebrook did not consult the PAC; stymied the investigation with the Executive Committee; and flatly refused to follow the Bylaws. Further, Glazebrook told Goven that Plaintiff was DGS in Spring 2013, a fact that Plaintiff highly disputes and was important to the OEO's exoneration of Plaintiff. Taking these facts in the light most favorable to Plaintiff, the Court finds a genuine issue of fact as to whether Glazebrook acted in her personal interest in Plaintiff's termination.

Further, Plaintiff was the party entitled to performance of the employment contract. A reasonable trier of fact could determine that Glazebrook's interference with the grievance

process made any performance of lesser value to Plaintiff. Multiple parties recognized that timing was important, including Glazebrook, the Grievance Committee, and Subcommittee (Dkt. #74, Exhibit J, L, S). Therefore, summary judgment is denied as to Plaintiff's claim against Glazebrook for tortious interference with contract.

However, Defendants have proved that no genuine issues of material fact exist as to the acts of Burggren and Goven. Despite Glazebrook's attempts to frustrate Plaintiff's grievance procedure, the Subcommittee found that due process was not violated at the College level, where Goven was in charge (Dkt. #74, Exhibit L at p.3). Further, Plaintiff has alleged only that Burggren interfered with the contract by "refus[ing] to rule" (Dkt. #36 at ¶¶ 86–87). Based on these facts, the Court finds no genuine issue with regard to whether Burggren and Goven were acting in their personal interest with regard to Plaintiff's termination. Therefore, the Court finds that there are no genuine issues of material fact regarding Plaintiffs claims of tortious interference against Burggren and Goven.

### Qualified Immunity

In defense, Defendants raise qualified and official immunity. Qualified immunity applies to Plaintiff's federal law claims while official immunity applies to Plaintiff's state law claims.

To establish § 1983 liability, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 678. Public officials whose positions entail the exercise of discretion may be protected by the defense of qualified immunity from personal liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant asserts the defense of qualified immunity and has established that the alleged actions were conducted pursuant to the exercise of his discretionary

authority, the burden then shifts to the plaintiff to rebut this defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

Courts have historically engaged in a two-pronged analysis to determine whether a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court must determine whether a "constitutional right would have been violated on the facts alleged." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004). Second, if a constitutional right was violated, a court then determines whether "the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. The law may be deemed to be clearly established if a reasonable official would understand that his conduct violates the asserted right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The official's subjective motivation is irrelevant to the qualified immunity defense except as far as it is relevant to the underlying constitutional claim. *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998). A government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of the right [are] sufficiently clear" such that every "reasonable official would have understood that what he is doing violates that right." *Creighton,* 483 U.S. at 640. The clearly established inquiry does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *See id.*; *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Supreme Court recently instructed courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009).

## Due Process—Property Interest

Defendants assert that they are entitled to qualified immunity. They argue it is not clearly established that a university may not decide to non-renew a "one-year, temporary, non-tenured" five-year appointment based on its belief that the lecturer had exercised "poor professional judgment" in engaging in a brief, romantic relationship with a young woman who was an incoming graduate student and employee in his Department (Dkt. #48 at p.31). As the Court explained above, the issue before the Court is not whether UNT could have terminated Plaintiff according to the contract alone. Instead, the issue is whether the representations made by Glazebrook, coupled with UNT's history of renewals of Plaintiff and other lecturers, created a series of rules and understandings fostered by the college administration.

The Court finds that the Supreme Court's holding in *Perry v. Sindermann* is controlling. Plaintiff was given a contract as a UNT lecturer with a five-year commitment at the option of UNT. Glazebrook assured him that UNT would annually renew his contract absent a serious violation or reduction in force. Plaintiff's contract was renewed in 2012 and 2013. In April 2014, Glazebrook reassured Plaintiff that he would receive his renewal when the OEO submitted its report. The OEO exonerated him. Nevertheless, Plaintiff was terminated July 3, 2014.

Plaintiff's reasonable expectation of continued employment in his fourth year of a five-year commitment was apparent to UNT officials because *Sindermann* is sufficiently clear on these facts that any reasonable official in Defendants' shoes would have understood that he was violating Plaintiff's rights. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). Therefore, Burggren, Goven, and Glazebrook are not entitled to qualified immunity with regard to Plaintiff's due process claim based on his property interest in employment.

<u>Tortious Interference</u>

Under Texas law, "[g]overnment employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Tamez v. City of San Marcos*, 118 F.3d 1085, 1097 (5th Cir. 1997) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)). Official immunity is an affirmative defense. *Chambers*, 883 S.W.2d at 653. Thus, the burden is on the defendants to establish all elements of the defense. *Id.* To rebut a defendant's claim of good faith, the plaintiff must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Tamez*, 118 F.3d at 1097 (citing *Chambers*, 883 S.W.2d at 657). The issue of official immunity in Texas is somewhat less likely to be resolved before trial than federal qualified immunity. *Chambers*, 883 S.W.2d at 657.

An officer acts within the scope of her authority if she discharges the duties generally assigned to her. *Id.* at 658. Regarding reappointment of faculty, Glazebrook did not have any general authority to terminate without an initial recommendation by the PAC (Dkt. #48, Exhibit 9 at p.7). Despite this, Glazebrook terminated Plaintiff without ever consulting the PAC. Therefore, the Court finds that Glazebrook was not acting within the scope of her authority.

Further, the Court finds that Glazebrook did not act in good faith. Specifically, the Grievance Committee and Subcommittee found that Glazebrook violated Plaintiff's due process rights when she did not follow the Department Bylaws both before and after issuing the non-renewal letter; that she stymied investigation efforts; and that she gave insufficient reasoning for the non-renewal. Glazebrook did not have the independent authority to fire Plaintiff without advice from the PAC (*See* Dkt. #48, Exhibit 9 at p.7; Dkt. #74, Exhibit P at pp.16, 17). Finally, Glazebrook could not give Goven the recommendation of the PAC as required by the

Constitution of the College of Arts and Sciences because she never consulted with that committee. Therefore, the Court finds that no reasonable person in Glazebrook's position could have thought the facts justified her termination of Plaintiff.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. #48) is hereby **GRANTED** in part and Plaintiff's claim for due process on the theory of a liberty interest in employment against all Defendants is **DISMISSED**.

It is further **ORDERED** that Plaintiff's claim for tortious interference against Burggren and Goven is **DISMISSED**.

Defendants' motion is **DENIED** in all other respects.

**SIGNED this 14th day of December, 2016.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE