# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DALE A. WILKERSON | § | |
| | § | |
| v. | § | Civil Action No. 4:15-CV-00540 |
| | § | Judge Mazzant |
| UNIVERSITY OF NORTH TEXAS, | § | |
| By and Through its Board of Regents | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant University of North Texas's ("UNT" or "University"), by and through its Board of Regents, Motion for Summary Judgment (Dkt. #122). Having considered the motion and the relevant pleadings, the Court finds that the motion should be denied (Dkt. #122).

## BACKGROUND

Plaintiff Dale A. Wilkerson filed suit against UNT and its administrators on August 10, 2015 (Dkt. #1). Plaintiff initially alleged six causes of action against the Defendants (Dkt. #1 at pp. 22–31). After three years of litigation, multiple dispositive motions, and an interlocutory appeal to the United States Court of Appeals for the Fifth Circuit, only one claim and one Defendant remain—Plaintiff's Title IX retaliation claim against UNT (Dkt. #42; Dkt. #85; Dkt. #86; Dkt. #92; Dkt. #96; Dkt. #108 at ¶¶ 82–92); *see Wilkerson v. Univ. of N. Tex. By & Through Bd. of Regents*, 878 F.3d 147 (5th Cir. 2017), *reh'g denied*, (Jan. 30, 2018).

The Fifth Circuit summarized the facts of this case on appeal:

> [UNT] is a state institution with a formal tenure track. Plaintiff . . . was never on that track. He was instead an untenured lecturer in the University's Department of Philosophy and Religion Studies from 2003 to 2014. For the first eight years, he and the University entered separate, one-year teaching contracts. In 2011, Wilkerson became the Philosophy Department's "Principal Lecturer."

Wilkerson's "Principal Lecturer" contract provided a "temporary, non-tenurable, one-year appointment with a five-year commitment to renew at the option of the University." As he was signing that contract, Wilkerson avers, the department chair [Patricia Glazebrook] explained that the optional-renewal provision was "a convenience" in place only "in the event a reduction in workforce were necessary" or "in the event of a major policy violation." But the written agreement included this integration clause: "No previous written or oral commitment will be binding on the University except as specified in this letter" and its attachments.

. . . .

Twice the University renewed Wilkerson's contract. It was during his first renewed term—in March 2013—that Wilkerson attended a student-recruitment party hosted by the department's then-Director of Graduate Studies. There, Wilkerson met C.B., a 26-year-old, incoming graduate student. The two had a brief relationship. Several times in June 2013 they met at Wilkerson's house. Twice they kissed. A few weeks later, C.B. joined Wilkerson and another female grad student on an overnight trip from Dallas to Memphis. As the complaint tells it, the three shared a hotel room and a platonic evening.

By September 2013, Wilkerson had become his department's Director of Graduate Studies and C.B. had matriculated. A few months passed before C.B. filed a formal complaint with the University, contending that Wilkerson sexually harassed her the past summer. Those allegations complicated Wilkerson's renewal process. When prodded why the school had not yet renewed Wilkerson's contract, Glazebrook told him that his renewal hinged on an internal investigation. That inquiry, headed by the University's Office of Equal Opportunity (OEO), found no violation of the University's consensual relationship policy and insufficient evidence of sexual harassment.

Glazebrook then checked with the University's general counsel and the dean about renewing Wilkerson's contract. Though school policies gave Glazebrook an integral role in deciding whether to hire and retain faculty, they also contemplated that Glazebrook would consult her department's "Personnel Affairs Committee" before recommending Wilkerson's non-renewal. She did not do so. Rather, on July 3, 2014, she sent Wilkerson a letter (on University letterhead) informing him that his appointment would not be renewed. The letter reminded Wilkerson that his position was

"renewable annually at the option of the University" and instructed him how to appeal.

Wilkerson appealed to the College of Arts and Sciences Ad Hoc Grievance Committee. That body permitted Wilkerson, with counsel by his side, to present, object to, and confront witnesses and evidence during a hearing. At this hearing, Glazebrook defended her decision by citing Wilkerson's "poor judgment." The Committee was unpersuaded. It recommended that the college dean "reverse the non-renewal decision," concluding that "the procedural By-Laws of the Department were violated and . . . Glazebrook provided insufficient evidence to justify the non-renewal."

Wilkerson appealed again, this time to the interim Provost and Vice President for Academic Affairs—[Warren Burggren]. Burggren charged another committee with investigating further. This second committee interviewed Wilkerson, C.B., Glazebrook, Goven, and several other faculty members. It then issued a report, opining that Glazebrook "did not follow due process" because she disregarded the bylaws requiring the Personnel Affairs Committee to appraise her decision. "Nonetheless," the report observed, "Wilkerson did indeed exercise poor professional judgment in his interactions with [C.B.]." It also found Wilkerson's chief objection—that Dean Goven relied on ex parte statements regarding when Wilkerson accepted the position of Director of Graduate Studies—"irrelevant to the final outcome." As this committee saw it, "[t]he charge of poor judgment would remain whether or not Wilkerson was [Director] because his involvement with [C.B.] was not appropriate given her position as an incoming graduate student and employee in the [Philosophy] Department." Despite nodding toward a "final outcome," however, the report balked; it offered no view on whether to reappoint Wilkerson.

By the time this report issued, Finley Graves had already replaced Burggren as Provost. Graves reviewed the relevant records—including those Wilkerson gave him—and upheld Glazebrook's decision. Wilkerson got word on March 17, 2015, and commenced this lawsuit.

*Wilkerson*, 878 F.3d at 151–53.[1]

---

1. Plaintiff filed a Second Amended Complaint on May 4, 2018—after the Fifth Circuit's decision (Dkt. #108). However, the factual allegations in his Second Amended Complaint are nearly identical to those in his First Amended Complaint (Dkt. #36).

In his Second Amended Complaint, Plaintiff alleges retaliation pursuant to Title IX (Dkt. #108 at ¶¶ 82–92). Specifically, Plaintiff claims UNT retaliated against him because he testified, assisted, and participated in the investigations, proceedings, and hearings concerning his alleged violations of UNT's sexual harassment and consensual conduct policies (Dkt. #108 ¶ 87). Plaintiff claims the evidence demonstrates UNT's clear discriminatory animus (Dkt. #108 at ¶¶ 82–92).

On September 7, 2018, UNT filed the motion for summary judgment at issue seeking summary disposition of Plaintiff's Title IX claim (Dkt. #122). On September 28, 2018, Plaintiff filed a response to the motion (Dkt. #125). On October 5, 2018, UNT filed a reply to the motion (Dkt. #126). Accordingly, UNT's motion for summary judgment is ripe for review (Dkt. #122).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

UNT moves for summary judgment on Plaintiff's Title IX claim arguing: (1) *Lakoski* preemption bars Plaintiff's Title IX claim; (2) alternatively, the Supreme Court of the United States has not recognized a Title IX "participation clause" claim; and (3) Defendant did not renew

5

Plaintiff's contract because he exercised poor judgment (Dkt. #122 at pp. 16–28) (referencing *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995)).[2] The Court addresses each argument in turn.

## I. *Lakoski* Preemption

### A. Title VII and Title IX

Simply put, Title VII provides a remedy for employment discrimination whereas Title IX provides a remedy for sex discrimination found in any education program or activity receiving Federal financial assistance. *See* 20 U.S.C. § 1681; 42 U.S.C. § 2000e. Understandably, these roles are muddled when federally funded universities terminate employees. In such situations, "[t]he relationship between [T]itle VII and [T]itle IX is complex." *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).

### B. *Lakoski* and *Lowrey*

The Fifth Circuit addressed the complex relationship between Titles VII and IX on at least two occasions. In *Lakoski*, the Fifth Circuit held that "Title VII provides the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions." 66 F.3d at 753. In other words, "Title IX does not afford a private right of action for employment discrimination on the basis of sex in federally funded educational institutions." *Lowrey*, 117 F.3d at 247.

In *Lowrey,* the Fifth Circuit considered whether the holding in *Lakoski* applied to Title IX retaliation claims. 117 F.3d at 242–53. The Fifth Circuit decided that Title IX created a private cause of action for retaliation against the employees of federally funded educational institutions. *Id*. Unlike employment discrimination on the basis of sex claims, the Fifth Circuit concluded that

---

2. The Court recently addressed a similar preemption argument raised by Defense Counsel in a separate case. *See Slabisak v. Univ. of Tex. Health Sci. Ctr. at Tyler*, 4:17-CV-597, 2018 WL 1072511, at *2–3 (E.D. Tex. Feb. 27, 2018).

Title VII retaliation claims do not necessarily preempt Title IX retaliation claims when the alleged

retaliation concerns an employee who suffers unlawful retaliation "solely as a consequence of

complaints alleging noncompliance with the substantive provisions of [T]itle IX." *Id.* at 254. The

Fifth Circuit explained:

> In order to determine whether [T]itle IX affords Lowrey a cause of
> action for retaliation, we must first "strip away" any allegations that
> would support a private cause of action for retaliation under [T]itle
> VII. To do so, we must distinguish between retaliation suffered by
> Lowrey as a consequence of her participation in complaints and
> investigations challenging alleged employment discrimination by
> [the university] and retaliation suffered as a consequence of her
> participation in complaints and investigations challenging alleged
> violations of [T]itle IX. Insofar as the former allegations form the
> basis of this retaliation claim, Lowrey's cause of action is barred
> under the analysis employed in *Lakoski*.

*Lowrey*, 117 F.3d at 247. Accordingly, Title VII preempts a Title IX retaliation claim when the

alleged retaliation occurs as a consequence of the claimant's participation in complaints and

investigations challenging alleged employment discrimination. *Id.* However, Title VII does not

preempt a Title IX retaliation claim when the alleged retaliation occurs as a consequence of the

claimant's participation in complaints and investigations challenging alleged violations of

Title IX. *Id.* With this framework, the Court addresses UNT's first argument.

### C. UNT's Argument

UNT argues "after stripping away any of [Plaintiff's] allegations that would support a cause

of action for retaliation under Title VII—specifically, that [Plaintiff] participated in a sexual

harassment investigation arising from a student's claim filed against him—[Plaintiff] is left

without any factual support for his Title IX claim." (Dkt. #122 at pp. 18–19). Stated differently,

UNT contends that Plaintiff's Title IX retaliation claim is preempted by Title VII because the

retaliation alleged by Plaintiff occurred as a consequence of Plaintiff's participation in complaints

and investigations challenging employment discrimination, not violations of Title IX. *See Lowrey*,

117 F.3d at 247.

Plaintiff pleads that UNT retaliated against him for "participating and providing evidence

in an investigation of a sexual harassment claim." (Dkt. #108 ¶ 90). Further, Plaintiff contends

he "makes no complaint that he has been discriminated against because of his sex," "does not claim

a hostile work environment," nor does he claim "that it was his gender that was the basis for his

termination." (Dkt. #125 ¶ 6). Plaintiff argues:

> *Lakoski* preemption simply doesn't exist here because the only
> actions UNT took related to Wilkerson's participation in a Title IX
> investigation. *See Lowrey*, 117 F.3d at 254. That UNT terminated
> Wilkerson's employment does not magically transfer this to a Title
> VII matter. UNT's analysis is fundamentally flawed because even
> though Title IX and Title VII share similar paths they are
> nevertheless different roads.

(Dkt. #125 ¶ 8).

The Court agrees. Plaintiff claims UNT terminated him in retaliation for his participation

in a Title IX investigation. Title VII does not preempt a Title IX retaliation claim when the alleged

retaliation occurs as a consequence of the claimant's participation in investigations challenging

alleged violations of Title IX. *Lowrey*, 117 F.3d at 247. Accordingly, *Lakoski* preemption does

not apply here.

The Court's previous ruling in *Slabisak* is distinguishable. 2018 WL 1072511. In *Slabisak*,

the plaintiff's Title IX deliberate indifference and retaliation claims alleged that she "was subjected

to a hostile work environment, which [the defendant] failed to address and correct; and moreover,

that [the defendant] retaliated against [the plaintiff] when she informed them of said hostile work

environment." *Id.* Therefore, Title VII preempted the plaintiff's Title IX retaliation claims as the

plaintiff's Title IX claims arose as a consequence of her participation in complaints challenging alleged employment discrimination, not violations of Title IX.

## II.    Remaining Arguments

The Court has previously addressed and denied Defendant's remaining arguments. *See Wilkerson v. Univ. of N. Tex.*, 223 F. Supp. 3d 592, 602–03 (E.D. Tex. 2016) (finding Plaintiff can legally maintain his Title IX retaliation claim); *Wilkerson v. Univ. of N. Tex.*, 4:15-CV-00540, 2016 WL 6997213, at \*4 (E.D. Tex. Nov. 30, 2016) (finding genuine issue of material fact on Plaintiff's Title IX retaliation claim). The Court will not readdress these issues here.

### CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for Summary Judgment is hereby **DENIED** (Dkt. #122).

**SIGNED this 4th day of December, 2018.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE